[No. 26904.   Department One.   May 17, 1938.]

J. J. LANZA, *Respondent*, v. THE ESTATE OF C. D. HILLMAN, *Deceased, et al., Appellants.*[1]

*Clarence L. Gere* and *Adam Beeler*, for appellants.

*Eggerman & Rosling (W. S. Greathouse*, of counsel), for respondent.

GERAGHTY, J.—This is a suit on a promissory note. The complaint alleged the execution and delivery, for a valuable consideration, by the Hillman Investment Company and C. D. Hillman of their promissory note payable to H. L. Hillman, a brother of C. D. Hillman, and its endorsement by the payee, for value and before maturity, to the plaintiff. The note, for six thousand dollars, purports to have been signed January 10, 1931, was payable five years after date, bore interest at the rate of six per cent, payable annually, and provided that, if interest was not paid as provided, the whole sum of both principal and interest would become immediately due and collectible at the option of the

[1] Reported in 79 P. (2d) 643.

holder of the note; an attorney's fee of one hundred dollars was provided for.

The complaint alleged the endorsement of the note in blank by the payee, H. L. Hillman, and its delivery to the plaintiff; that no sums had been paid on the note, notwithstanding the fact that interest was to be paid annually; and that, by reason of this default, the plaintiff elected, under provisions of the note, to declare the whole sum of principal and interest due.

It was alleged that C. D. Hillman had, since the execution of the note, died, and that his estate was then in course of probate in the superior court of King county; that, within the time allowed for the presentation and filing of claims, the plaintiff presented his claim upon the note to the administrator, J. Homer L. Hillman, who, thereafter, notified plaintiff that the claim was rejected; and that demand for payment had also been made upon the defendant corporation, the Hillman Investment Company.

The defendants, in their answer, admitted the death of C. D. Hillman, the appointment and qualification of the administrator of his estate, the rejection of plaintiff's claim, and that no payment had been made on the note on account of principal or interest.

By way of an affirmative defense, the answer alleged that the purported promissory note was not genuine either as to time or substance, and was a fraudulent attempt to obtain money from the defendants; that any purported promissory note held by the plaintiff or his assigner, H. L. Hillman, was wholly without consideration and void; and, finally, that the plaintiff was not the real party in interest. These affirmative defenses were denied by the plaintiff in his reply.

After institution of the action and before trial, the payee in the note, H. L. Hillman, died.

At the conclusion of the trial, without a jury, the

court made the following findings of fact material to the issues:

"I.

"That the promissory note, Plaintiff's Exhibit 1, is genuine and that the signatures thereon are the signatures of the Hillman Investment Company by C. D. Hillman, president, and the signature of C. D. Hillman, individually, and that the endorsement thereon is that of H. L. Hillman, and that said note was executed without fraud, forgery, or illegality of any kind, and, for value, was delivered to H. L. Hillman. The said H. L. Hillman endorsed said note in blank and delivered the same to R. Kline Hillman on December 16, 1935, for value and before the note was overdue and that R. Kline Hillman took the same in good faith and without notice of any previous dishonor, and that the note had not been dishonored previously. That R. Kline Hillman had no notice of any infirmity in the note or defect in the title of H. L. Hillman therein and that no infirmity or defect existed therein. That said note was and is complete and regular on its face.

"II.

"That thereafter on December 16, 1935, R. Kline Hillman delivered said note, so endorsed in blank·to J. J. Lanza, plaintiff herein, and that he and Alfred Harsch who paid part of the value for said note, had no notice of any infirmity therein or defect of title thereto. That Lanza became the holder of said note before it was overdue and without notice of any previous dishonor, and took the same in good faith and for value.

"VII.

"That demand was made upon the Defendants in this action for payment of said note and that no payment has been made thereon, and that the full sum of $6.000.00 principal with interest thereon at the rate of 6 per cent per annum from January 10, 1931, is due and owing, together with $100.00 attorney's fees stipulated in said note. That Plaintiff elected to declare the full amount of said note due and owing by virtue of default in interest.

"VIII.

"That the Hillman Investment Company is a corporation organized under the laws of the State of Washington with a principal place of business in the City of Seattle, Washington. That the Defendants, the Hillman Investment Company and the Estate of C. D. Hillman, deceased, are each primarily liable on said note. That C. D. Hillman was President of the Hillman Investment Company and had authority to execute Exhibit 1 on its behalf."

Upon these findings and appropriate conclusions of law, judgment was entered in favor of the plaintiff for the face of the note, with interest, attorney's fees, and costs. The defendants appeal.

The appellants' chief assignment of error is based upon the insufficiency of the evidence to sustain the quoted findings of fact.

The principal issue of fact is whether the signature on the note, purporting to be that of C. D. Hillman on behalf of the Hillman Investment Company, and of himself, is genuine.

It is stipulated that the Hillman Investment Company, from approximately 1920 onward, was owned and controlled by the Hillman family, and that C. D. Hillman owned a substantial portion of the stock and was authorized by the corporation to execute obligations on its behalf. He was engaged extensively in the real estate business in Seattle and was a man of means. His brother, H. L. Hillman, named as payee in the disputed note, was also engaged in that business and, for a considerable time, had been associated with his brother and jointly interested with him in some large real estate ventures. In the course of their business relations, some serious disputes had arisen, resulting, on one or two occasions, in litigation, but it does not appear that they became permanently estranged.

As a result of the financial panic of 1929, H. L. Hillman lost the bulk of his property interests, including his home in Seattle. He had some interests in the Yakima valley and removed to the city of Yakima in an unsuccessful effort to recoup his fortune. He was pressed by creditors, some of whom secured judgments against him. He had told his creditors that he had no resources with which to pay and that his earnings were negligible. At the time of the endorsement and delivery of the note to the respondent, H. L. Hillman addressed him a letter, in which he said:

"The assignment and transfer of this document to you is made upon the following conditions. Said assignment and the holding of said promissory note by you shall be for the benefit of R. Kline Hillman to the extent of 80 per cent of the proceeds thereof, and Alfred E. Harsch of Seattle to the extent of 20 per cent of the proceeds recovered thereon.

"Your acceptance of said promissory note will be upon the above recited conditions."

R. Kline Hillman was the son of H. L. Hillman, and Alfred E. Harsch a son-in-law. The son testified that he had advanced his father, since 1929, sums aggregating $5,500, $4,000 of this before assignment of the note, and $1,500 afterwards. He testified that he had sought security from his father for these advances, and discovered the existence of the note about the time of C. D. Hillman's death. Mr. Harsch, the son-in-law, advanced $500.

L. E. Kirkpatrick, a practicing attorney, testified that he had been associated for several years with C. D. Hillman prior to 1917, during which time he had seen Mr. Hillman writing his name many times; that he had corresponded with him and had seen instruments which had been signed by him. He identified the signatures on the note as that of the corporation by Hillman as president and as that of Hillman in-

dividually. He had, before the trial, examined other instruments bearing Hillman's signature, and this examination confirmed his impression of the genuineness of the note; that, without examination of the other signatures, he would have identified the one on the note from recollection.

Two hand-writing experts, called by the respondents, testified to the genuineness of the C. D. Hillman signature on the note, although admitting that it bore more resemblance to earlier signatures of Hillman than to those admittedly made in 1931, the year in which the note purports to have been executed.

One of these experts testified that the typewritten part of the note was made before the signature. He reached this conclusion from the circumstance that the initial letters of the penned signature of the Hillman company extended slightly over the typewriting; this fact would seem to be evident even to a layman after examination through a magnifying glass. One of the respondent's experts testified that every letter of the signature on the note has some of the characteristics of the same letters found in admittedly genuine signatures made about the date borne by the note.

Officials of banks with whom Hillman did business testified that the signature on the note was not his signature current at its date. Mr. J. W. Maxwell, of the National Bank of Commerce of Seattle, testified to an acquaintance with Hillman extending over many years. He had examined many signatures of the Hillman Investment Company, and had made many loans to it from 1911 until 1929. He said that the challenged note had in it one more word than most of the signatures he was familiar with in recent years, that is to say, the word "The" in the company's name. He thought Hillman had dropped the word "The" from the signature years before.

"I know that for a number of years before Mr. Hillman passed away he was not feeling well and that the signature on Exhibit '1' [the note] was not the correct title on the date it bore, because the 'The' had not been used for many years."

He further testified that he had every reason to believe that, from 1922 until the date of his death, both Hillman and the investment company could pay anything they owed. Hillman was a buyer of bonds and would have been able to take care of an obligation of six thousand dollars any time during the period from 1930 to 1935, and that the bank would have extended credit on such a note.

Luke S. May, an expert on questioned documents, testified that he had compared the signature on the note with a large number of genuine signatures extending over a long period, and that the questioned signature was identical with Hillman's handwriting in 1907, 1908, and 1909, but not identical with his handwriting in 1931; that the signature on the note could not have been made later than 1925. He admitted, however, that Hillman's writing was variable and that many things could cause these variations.

Since both of the Hillman brothers are dead, there is no evidence in the record throwing any light on the circumstances under which the note was executed. There is no record of any demand made by H. L. Hillman for payment of interest or of any part of the principal. Strong inferences against the authenticity of the note might be drawn from the fact that, notwithstanding his pressing need for money, H. L. Hillman made no use of the note, although, as testified, if genuine, it could have been sold to the bank or taken as security for a loan. In announcing his decision, the trial court said:

"So we have a signature which the Court is satisfied, and which, I think, all the experts who testified were

satisfied, is a genuine signature of the Hillman Investment Company and Mr. Hillman as president, and Mr. Hillman personally; but the legal question then arises whether if a signature is found upon a document dated in 1931 it becomes a binding obligation unless you can show other things that would destroy it. Since it is clear from the testimony of the experts that the typewriting of the 'hundred' where it says 'hundred' in the numerals for the attorneys fee, was placed upon it prior to the pen writing, we must conclude at least that that portion of the typewriting was placed on there prior to the placing of the ink signature. That does not prove, of course, that the balance of the typewriting was not placed there at the same time; although I assume if it was not at the same time—that the expert could determine that the typewriting was placed at different times.

"Now, the question arises, if such a note is found in the hands of the brother of the maker, and the evidence indicates that the signature had been placed on there at a prior time, raises such a presumption that the Court would be justified in saying from the evidence that it is a forgery or that it is not a genuine note. I think the more reasonable presumption would be, however, that it was a genuine note, and that it was delivered at or about the time of the date, but that the circumstances under which the note was made up might indicate that the note was not fully made up at that particular time. . . .

"During this trial, which has now lasted eight or nine days,—seven days of actual trial,—during that time there has constantly been recurring in my mind mornings and evenings when I have been thinking about the evidence and different situations that could be possible, and it seems to me that there have been fifty or sixty reasons for finding it never was executed, or, if executed, was executed at a very early date, never intended to be delivered, and probably fifty reasons whereby you could say it was intended to be delivered and was delivered, and so forth. In other words, there are just as many reasons you can urge as to why it is not as to why it is."

In this mental attitude, with the advantage of seeing and hearing the witnesses, the trial court resolved the conflicting evidence and probabilities in favor of the authenticity of the note. In reviewing here, on the cold typewritten record, the trial court's decision, we experience all of its difficulties increased by the absence of the living witnesses present at the trial below.

■ After a painstaking examination of the extensive record before us, we are unable to say that the evidence preponderates against the court's finding.

In *Pugh v. Doupe,* 130 Wash. 498, 228 Pac. 301, where the testimony was evenly balanced, we said:

"From the printed record, it is difficult to determine which way the preponderance of evidence lies. It is about as equally balanced as will be found in any lawsuit.

"It is not the rule that we will interfere with the court's findings on disputed facts unless we can determine that the preponderance of the evidence is with them; but the rule is that we will not interfere unless we can determine from the record that the preponderance of the evidence is against them. Having read the testimony, we cannot say that the court was wrong. On such close questions of fact, it is entirely proper that we do not interfere. For this reason the judgment is affirmed."

The rule announced in that case is equally compelling here.

Our conclusion on the main issues makes it unnecessary to discuss appellants' other assignments. The judgment is affirmed.

STEINERT, C. J., HOLCOMB, SIMPSON, and MAIN, JJ., concur.